(No. 46272.—

ONE HUNDRED SOUTH WACKER DRIVE, INC., *et al.,* Appellees, v. SZABO FOOD SERVICE, INC., Appellant.

*Opinion filed March 24, 1975.*

Bernard Harrold and John M. Lison, of Chicago (Wildman, Harrold, Allen & Dixon, of counsel), for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, of Chicago (John J. Witous, Frank L. Schneider and James T. Ferrini, of counsel), for appellees.

MR. JUSTICE DAVIS delivered the opinion of the court:

The plaintiffs, One Hundred South Wacker Drive, Inc. (Wacker), and International Business Machines Corporation (IBM), filed suit in the circuit court of Cook County against Szabo Food Service, Inc. (Szabo).

The plaintiff Wacker is lessor and the defendant Szabo is the lessee under a lease covering part of the premises at 100 South Wacker Drive in Chicago. The plaintiff IBM is another tenant in the premises, whose property was damaged by the fire in question.

On April 3, 1968, while Szabo was engaged in the operation of its food business, a fire occurred upon the leased premises which caused substantial damage to both the premises leased to Szabo and to other parts of the building, for which the plaintiff Wacker sought damages in the sum of $500,000 and the plaintiff IBM sought damages for $2,500.

The complaint was in five counts, wherein Szabo was charged with several specific acts of negligence. Count II was based on the doctrine of *res ipsa loquitur,* and count III charged several violations of the Chicago Municipal Code contrary to Szabo's express duty under the lease. Count V charged violations of various specific provisions of the lease.

Szabo moved for judgment on the pleadings as to

Wacker, which motion was denied. Szabo then moved to vacate that order, which motion was granted, and judgment on the pleadings was thereafter granted to Szabo. The circuit court found no just reason for delaying appeal. Wacker appealed to the appellate court, which reversed the circuit court. (14 Ill. App. 3d 438.) We granted leave to appeal.

The question here presented is one of law. The issue presented for resolution is whether the parties to the lease, considering the lease as a whole in the light of our prior decisions in *Cerny-Pickas & Co. v. C. R. Jahn Co.* (1955), 7 Ill.2d 393, and *Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill.2d 32, manifested an intent to exculpate the lessee from liability in event of loss by fire through negligence of the lessee.

The appellate court was of the opinion that the case hinged on the interpretation to be given to the yield-back clause of the lease. While that clause is important to the adjudication of the case, it is the law in Illinois that the proper construction to be given to a lease is to be determined by consideration of the instrument as a whole. *Cerny-Pickas & Co. v. C. R. Jahn Co.* (1955), 7 Ill.2d 393, 396.

The lease contained the following yield-back clause:

"XIV. At the termination of this lease by lapse of time or otherwise:

\* \* \*

2. Tenant shall return the Leased Premises and all equipment and fixtures of Landlord in as good condition as and when Tenant originally took possession \*\*\* *ordinary wear and loss or damage by fire or other casualty \*\*\* excepted,* failing which Landlord may restore the Leased Premises to such condition and Tenant shall pay the cost thereof." (Emphasis ours.)

The defendant contends that this provision exculpates it from any liability for any fire damage to the entire building, caused by its negligence; the plaintiff, on the other hand, insists that it exculpates the defendant for fire

damages only to the leased premises. The defendant relies principally on the following cases: *Cerny-Pickas & Co. v. C. R. Jahn Co.* (1955), 7 Ill.2d 393; *Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill.2d 32; and *Belden Manufacturing Co. v. Chicago Threaded Fastners, Inc.* (1967), 84 Ill. App. 2d 336.

The plaintiff Wacker sets forth the rationale on which its suit was based in the first paragraph of the argument in its brief in this court:

> "It should be understood at the outset that plaintiff did not carry fire insurance in an amount sufficient to cover the entire loss of April 3, 1968. It is plaintiff's position that it had the right, in determining the extent of coverage which it would procure, to rely upon defendant's lease obligations—the requirements that defendant comply with all laws, that defendant refrain from use of inflammable fluids—as well as upon defendant's common responsibility to exercise due care."

This argument seems to assert a right in the plaintiff to underinsure the premises. This assertion will be more extensively considered after we have examined the lease as a whole.

The plaintiff makes this argument in spite of the fact that *Cerny-Pickas* was decided several years before the building in question was built. The underlying rationale of the court in *Cerny-Pickas* was that in determining the coverage of insurance to be purchased, certain terms need to be defined. In *Cerny-Pickas,* the parties had obviously seen the necessity of providing against loss by fire, and to that end it was provided in the lease that the lessor should pay for the fire insurance on the building and the lessee would pay the increased costs of the premiums, due to lessee's business. The court in *Cerny-Pickas,* while dealing with a situation not quite the same as here, in discussing the argument that the lease applied only to breaches of contract, said:

> "There are areas of the law in which the distinctions between liability in contract and

liability in tort may be significant, despite their remote and accidental origin. We are not satisfied, however, that such distinctions are relevant in determining the meaning to be given to words used by laymen in defining their rights and obligations. The word 'fire' is used without qualification throughout the lease before us. Its natural meaning would include all fires, regardless of their origin. To express the meaning for which the lessor contends, the lease would have to be altered to modify the word 'fire' by the qualifying words 'not due to lessee's negligence.' It is more reasonable to assume, we think, that laymen would regard the word 'fire' as including all fires whether of negligent origin or otherwise. *Under familiar standard fire insurance policies the insurer is obligated to pay for fires caused by negligence.* [Citations.] '' (Emphasis ours.) 7 Ill.2d 393, 397.

It is clear, then, that the rule is that a clause exculpating a lessee from liability for loss by fire applies to fire damage attributable to the lessee's negligence. The sole remaining question is whether the same result would apply to the remaining portions of the building, as well as to the leased premises. The answer to this question must be determined from the intent of the parties, as evidenced by the provisions of the lease as a whole.

Wacker argues that the key to the analysis is the leasehold interest of this lessee considered in terms of property law. The basic premise is that, in order to be the beneficiary of a policy of insurance, a party must have an "insurable interest" in the property. Wacker then argues that inasmuch as the portion of the building's total fire insurance premium to be paid by Szabo was figured on the basis of percentage of the whole of square footage leased to Szabo, only those square feet of the leased premises are covered by insurance paid for by Szabo. However, this

argument fails to recognize that the proportion of the insurance costs that each tenant pays is based upon the ratio of its leased space to the total leased space in the building. The formula does not relate to the total area of the building. A large area within the building is not leased and is thus retained by the landlord-owner. If only the landlord has an insurable interest in the unleased area, then only the landlord-owner can insure this unleased area and only the landlord can suffer a fire loss thereto. Secondly, Wacker relies on the fact that the yield-back clause refers solely to the leased premises.

The argument that the yield-back provision is controlling here overlooks the other pertinent provisions of the lease and the lease as a whole, and this argument can find support only by a superficial reading of the *Cerny-Pickas* and *Stein* decisions. The use of the yield-back clause, as the sole tool in determining insurance coverage of the remainder of the building, is at best the use of a neutral factor. It is no more logical to say that it dictates noncoverage of the remainder than to say it dictates coverage. The yield-back clause, by its terms, does not address the question of liability for damage to the remainder. We must, therefore, look to the lease as a whole and the underlying rationales of the *Cerny-Pickas* and *Stein* decisions, and determine, on the basis of the underlying principles enunciated therein, whether they are equally applicable to the question of coverage of the remainder.

Paragraph XI(5) of the lease, under the entitlement of "Insurance Rates," provides:

> "If by reason of the failure of Tenant to comply with the provisions of this paragraph, any insurance premium shall at any time be increased above what it otherwise would be, Tenant shall reimburse Landlord to the extent of all such increases in premiums paid by Landlord."

Paragraph XI(5) above quoted certainly assumes that the landlord would carry fire insurance on the building of which the leased premises were a part.

Under section IX of the lease, Szabo released all claims against Wacker for injury to person or damage to property sustained by Szabo or by any occupant of the leased premises occurring therein, resulting directly or indirectly from any condition or defect in the leased premises or from equipment becoming out of repair or from accident or negligence or omission of any tenant or occupant of the building. Section IX applied especially, but not exclusively, to damage caused by the flooding of basements or other subsurface areas, or by refrigerators, sprinkling devices, air-conditioning apparatus, water, snow, frost, steam, excessive heat or cold, falling plaster, broken glass, sewage, gas odors or noise, or the bursting or leaking of pipes or plumbing fixtures, and applied equally whether from the act or omission of other tenants. Section IX further provided that:

"*** If any such damage to the Leased Premises or to the Building or to Tenants thereof, results from any act or omission or negligence of Tenant, its agents, employees or invitees, Landlord may at Landlord's option, repair such damage and Tenant shall, upon demand by Landlord, *reimburse Landlord or its insurer forthwith for all costs of such repairs and damages both to the Building and to the Tenants thereof.* ***" (Emphasis ours.)

The above quoted part of paragraph IX of the lease illustrates that the landlord can effectively and specifically relieve itself of liability for damages caused by any omission or neglect of the tenant, its agents or employees, if the landlord so desires. By this clause the landlord caused the tenant to assume liability for any damage caused by its omission or neglect, or that of its agents or servants, with reference to the cost of repairs for the certain specific types of damage therein referred to.

Paragraph XVII of the lease provides that if the premises or building is made untenantable by fire or other casualty, the landlord may elect (a) to terminate the lease, or (b) proceed with all due diligence to repair, restore or rehabilitate the building or the leased premises, at the

landlord's expense, in which event the lease will not terminate; and the lease further provides that in event the leased premises are partially damaged by fire or other casualty, but not made wholly untenantable, then the landlord shall, subject to certain exceptions, proceed with all due diligence to repair and restore the leased premises, and the rent shall abate in proportion to the decrease in tenant's gross sales from the last previous accounting period, during the period while repairs are in progress; and the lease covers the contingency in event the premises are made partially untenable during the tenth year of the term or of the option period of the lease.

This paragraph of the lease certainly indicates that the landlord considered the contingency of fire within the leased premises, and that the landlord considered repairing the premises at its expense.

Paragraph II of said lease provided:

"II. Tenant agrees to pay, as additional rent here-under, for each lease year during the fourth (4th) to tenth (10th) lease years, inclusive, and for each lease year of any extension of the term hereof, a proportion of any increase in direct expenses paid or incurred by Landlord on account of the operation or maintenance of the Building over prevailing costs in effect for the first full year of occupancy of the Leased Premises. Such additional rent, if any, shall be determined for each twelve-month period ending June 30, and shall be payable by the Tenant on the succeeding September 1 of each year, but only after written notice and demand by the Landlord. Said proportion shall be such fraction of the increase in expenses as the space of the Leased Premises bears to the total rental space in the Building. The term 'expenses' as used herein shall include all direct costs of operation and maintenance as determined by standard accounting practices and shall include the following, by way of illustration and not limitation: real estate and personal property taxes; water and sewer charges; insurance premiums; license, permit and inspection fees; heat; light; air-conditioning; power; steam; labor, excluding janitor service and window washing; supplies; materials; equipment

and tools. The term shall not include depreciation on the building or equipment, interest, executive salaries or commissions."

The provision for the tenant to pay to the landlord extra rent to cover any increased direct expenses, including insurance premiums, indicates that the landlord intended to carry insurance on its building. The provisions of the whole lease cause us to conclude that the landlord, Wacker, would obtain fire insurance to protect its interest in the building.

We point out that Wacker's insurable interest argument was not the basis of our prior decisions. Both the *Cerny-Pickas* and *Stein* actions were brought by the landlords for the purpose of collecting for damages to the landlords' property interests in the buildings. There was no question of damage to the value of the leasehold interest. The language in those decisions relative to the payment of premiums by the lessee applies to insurance to protect the landlord's interest, and the landlord is expected to fully insure his own property. (*Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill.2d 32, 37-38.) It is immaterial whether or not the lessee had an insurable property interest in the remainder. The sole question is: In what manner did the parties contemplate the protection of the landlord's interest in the entire building against damage by fire?

We recognize that it is not realistic, even if possible, for a landlord to purchase separate policies of fire insurance for each leased portion of a building. Rather, the landlord purchases a policy covering the entire building, and in order to recover the cost of the premium, he prorates the insurance charges to the various tenants, on the ratio of each tenant's leased space to the total leased space in the building. This pro-rata share is then included as part of each lessee's rent. This court said in *Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill.2d 32, at pages 35 and 36:

"It is clear that the dominating consideration

in this court's ruling in *Cerny-Pickas* was its determination that the parties had intended that the lessor would look only to fire insurance proceeds to compensate it for fire losses, though the losses might be attributed to the lessee's negligence. The result was economically realistic, for the cost to the lessor of fire insurance premiums is an item expected to be considered in fixing the amount of rent. Thus, in practical effect it is intended that the premiums will be paid by the lessee through payments of rent. [Citations.] "

The intent of the parties is further set forth by provisions of the lease which specifically require that the lessee carry workmen's compensation insurance, public-liability insurance, products-liability insurance, and dram-shop insurance, as well as by a specific provision of the lease which requires that the lessee procure and maintain plate-glass insurance if the landlord so requests.

Although the tenant is specifically required to carry specified kinds of insurance, its responsibility with reference to fire insurance is limited to the obligation to pay for any increase in the fire insurance premium due to the nature of its business or the manner in which it was conducted. As the lessee was required to maintain the above insurance coverages, we conclude that fire insurance was to be maintained by the lessor-plaintiff-landlord.

The question then becomes whether the holding in *Cerny-Pickas,* concerning the scope of the coverage mandated by the term "fire insurance," is equally applicable to this lease. From our analysis of the lease in question, we conclude that the parties manifested an intent to exculpate the lessee in the event of loss by fire due to negligence of the lessee, for damages not only to the leased premises, but to the remainder of the premises as well.

Next, we turn to the lessor's argument that it had a right to underinsure the premises. A similar problem was

presented in *Stein,* and the answer given in that case is apropos here. There the court stated:

"It is reasonable to say that the parties intended that the lessors, who, from a study of the lease, are business persons of prudence and foresightedness, would procure fire insurance in an amount adequate for their protection. Pertinent to adequacy, the Supreme Court of Missouri has observed: 'If the lessor *** chose to carry insurance for less than the full value of the property, any detriment so resulting to it is due to its own fault. We need have no compunction here about the position of the insurers as subrogees. Fire insurers expect to pay fire losses for negligent fires and their rates are calculated upon that basis; indeed, we may well assume that a great majority of fires are caused by someone's negligence in a greater or lesser degree.' *Rock Springs Realty, Inc. v. Waid* [Mo. 1965], 392 S.W.2d 270, 278, 15 A.L.R.3d 774, 785; accord, *General Mills v. Goldman* (8th cir.), 184 F.2d 359, 365; see also, 'Effect of Exculpatory Clause in Lessees' Surrender Covenant,' 7 Duke L.J. 59, 62." 41 Ill.2d 32, 37.

Therefore, for all of the foregoing reasons we are of the opinion that the judgment of the appellate court should be reversed and that of the circuit court affirmed.

*Appellate court reversed;*
*circuit court affirmed.*